Case No. 17-1198 at Elm Sorenson Communications, LLC petitioner v. Federal Communications Commission at Elm Mr. Borelli for Petitioner Sorenson Communications, LLC Mr. Kay for Petitioner VRSBA Mr. Pasch for Respondent FCC and Ms. Rosen for MAP-CRI-COMFO Communications at Elm Mr. Borelli for Petitioner VRSBA Good morning. Good morning and may it please the Court, I'm Don Borelli for Sorenson. The FCC has conceded that the tiered rate structure that it preserved in the 2017 order is highly inefficient. That's a serious problem because Section 225 requires the FCC to ensure that functionally equivalent service is provided in the most efficient manner. Now the FCC is trying to solve that problem by redefining what functional equivalence means and claiming that it is necessary to keep all current providers in the market to ensure functional equivalence. But Section 225 does not support the idea of keeping consumer choice alive for the sake of consumer choice. The relevant text, what it requires, is that deaf persons be afforded the ability to engage in communication by phone in a manner that is functionally equivalent to that of a hearing person. It's about communication capability, not consumer choice. So the statute doesn't support that. And to the extent the FCC looked to communication capability, and that's trying to preserve the Spanish translation services and the deaf-blind services, what the FCC described as niche services, the tiered rate structure is probably the least efficient manner imaginable to preserve accessibility services. What the FCC determined was that this isn't great, but monopoly would be less efficient in the long term and far less reliable as a means for ensuring that we will have services provided in a way that's affordable for the fund going forward. So it's all going to work better if it's not a monopoly. Several points in answer to that, Your Honor. They did say something along those lines also, but there's several problems with their rationale. First, what they did here, in contrast, of course, to what they did in the 2013 order, where they said that Section 225's efficiency requirement is incompatible with the tiered rate structure because of the inefficiencies it generates. And they adopted a transition plan to try to move to greater efficiency. Now it's four years later, and what they're saying is we're going to stick with tiered rates in the hope that at some point in the future we will be in a position where we have closed the efficiency gap. Well, not just hope. I mean, they did say that we haven't yet got rid of the neutral platform, but we haven't yet really had enough time, for example, for the interoperability, transferability of technology to kick in. That had just started within the last year. And so the transition needed to go longer to see if these reforms would work. They just weren't ready to cut off the transition point yet because the only option seemed to be monopoly or continue the transition longer, let these other market reforms have more time to get some traction, and investigate other technological developments that seem to be happening very rapidly. Would that be unreasonable if that's how we read their decision? Well, I think it is unreasonable because I think it's important to drill down on what the record actually shows about the structural reforms. And I'll focus specifically on interoperability, but let me make a more general point first if I could, which is that there were a number of structural reforms that the FCC relied on in 2013 in thinking it would close the efficiency gap. Neutral platform, it abandoned. And portability of equipment, it's implemented, didn't have the desired effect. FCC has acknowledged it. What's left is interoperability. Now, what the record shows, and I think if you just trace through the sites, you'll see that, and I'll be happy to provide them, that the interoperability has been largely implemented. And what Sorenson showed in his comments in the record, supported by declarations, which you can find at pages 294 and 365 of the Joint Appendix, is that with respect to all carriers but one, global VRS, the interoperability problem has been solved. You'll notice the Commission doesn't address that in its order. Instead, what it does is cite in footnote 83 at JA-15 to comments from the smaller providers. Those comments can be found at JA-272 and 273. And what you will see if you look there is that there is a one-paragraph assertion by the smaller companies, supported by no declarations and no empirical analysis, suggesting that interoperability is a problem for them because when their customers can't connect with Sorenson, they blame their own company. So the whole idea here that the system that failed to work for four years and did not close the efficiency gap is going to work in the next four years. Interoperability didn't work for four years. It only had a one year. It had just come in in the last year, correct? Right. But as I said, Your Honor, the problem is what the record shows you, based on the empirical evidence and declarations, the problem is solved except for one of the two companies that makes up that small 3%. And I really don't think that what you're talking about is trying to close this efficiency gap that couldn't be closed, not only with these structural reforms four years ago, but remember there was a glide path there where the company's rates got lower year by year on the assumption that they were going to become more efficient and there was an end to it. So what's your predictive judgment about what will take place if your proposal is adopted? Single rate. So what we proposed, Your Honor, was a single rate with an analogy to a price cap approach. We'll set a single rate and then have the FCC build in a factor where it predicts efficiency gains over time and reduces the rate over time based on those predicted efficiency gains. Now, if companies do better than the predicted efficiency, they make even more, but they've got to at least match the predicted efficiency. The big difference between what we proposed and what the FCC did is that our proposal actually builds in a drive towards efficiency to close the efficiency gap. Their proposal doesn't. It relies entirely on this interoperability rationale, which I would submit really doesn't have any record support. If they say your proposal isn't efficient because it results in one company, Sorenson, getting a massive windfall, they have to set that price at an amount to still protect at least one other competitor that's going to result in Sorenson getting paid far more than the actual cost of delivering service. Why is it that alternative form of inefficiency that they were entitled to sort of pick the best of two bad options? Can I make two points about that? First, with respect to the specific rate and then with respect to the overall approach. With respect to the specific rate, we had indicated a rate of $3.73. That's public information. And the commission rejected that, saying we run the numbers on that. That's going to cost the fund more in the aggregate than our tier grade system. Respectfully, that's an apples to oranges comparison in a very important way. We calculated that $3.73 number based on the assumption that we would be compensated for the costs of research and development and IT. The commission disallowed those costs. If you take those costs out of our number and rerun, holding everything else constant, the number you come up with costs the fund, even in the short term, less. So that seems to me not justified. Can I just interject, and I do want to allow you to get to your second point, but if you take out the R&D costs and are talking about a lower permanent rate, is that a rate that is enough on this record to allow any competitor to remain in the market? We believe so. In candor, it won't allow the small, the smallest two that make up 3% to remain. But they've been in the market a long time, and as hard as they've tried, they haven't gone above this 3% threshold, and that's because consumers aren't choosing them. And so in order to keep those two companies in the record, you're actually draining an enormous amount of money from the fund. But if I could try to get back to a more general point, is that with our overall approach, we've built in a drive to close the efficiency gap over time. We've built in this efficiency enhancement. Theirs doesn't do that. In fact, it does the opposite, and I think this is a really important point, that if you contrast what the Commission did in 2013, where they did have a glide path for each company, they did something we disagreed with, in that they had started at a different place for different companies, rather than a single rate. But they had a glide path that goes down each year, because we expect you to get more efficient, and we're cutting it off in four years, so we have a real incentive to get efficient here, because it's not lawful to maintain the system indefinitely. Contrast that to what they did here. They put us on a glide path, because we are the most efficient, we keep getting more and more efficient. They didn't put anybody else on a glide path. Respectfully, I think that tells you all you need to know about whether the Commission thinks this efficiency gap is going to close over four years, because if they thought there was a realistic prospect of that, they would have tried to drive towards efficiency in the long term. And the fundamental problem with their system is there is nothing in it that drives towards efficiency in the long term. Well, they have a four-year rate that they've put in place, and they're going to be revisiting it. So that's one back-end assurance. And part of what I'd like to hear from you is you identify efficiency as lowest cost per minute, but clearly the Commission is also including in its understanding of efficiency market mechanisms that will put pressure on providers to improve the quality and nature of their services. And one of the concerns that they have is if you're fighting so hard to get the same total amount of money, but to get it at a flat rate rather than a tiered rate, what's in it for you? And what's in it for you on one version is to be the dominant or exclusive provider, and that is, on some lights, not efficient in terms of pressure to improve the quality of the service. Yeah, that's a really important point, and I'm glad your Honor raised it. Again, I don't think that this order holds up. That rationale does not hold up, and let me try to explain why. You start with the statutory text. What it requires is that functional equivalents be provided in the most efficient manner. Now, one thing the FCC does say in this order is that it's trying to create incentives for innovation beyond functional equivalents and that the tiered rates will do that indirectly by keeping multiple people in the market. But with all due respect, innovation above functional equivalents is not something that functional equivalents requires. You don't have to take my word for it. But why do you say innovation above functional equivalents? Functional equivalents evolved over time. As we who are hearing phone users know, the functional equivalents baseline has changed enormously over the last decade or two, and that's going to continue to be the case. And so the question is what's the mechanism to keep propelling that for the deaf community? So two points on that. First, Your Honor, the statute itself as it's currently constructed has a built-in hydraulic mechanism to achieve that. It says that the service that must be provided to deaf persons has to be functionally equivalent to the service provided to hearing persons. So as technology advances and quality improves and innovation occurs with respect to hearing persons, the law requires that that be matched to the extent possible. You can't be in this business and you can't meet the minimum standards that the FCC says. The FCC's judgment is that that would be better attained if there's more competition? Well, here's the problem with that, I guess, Your Honor, and you don't have to take it from me. I want to refer the Court to what the FCC has said about this very question in this very order. It's in paragraph 11 of the order, which is at JA6. Now what the FCC is discussing here in this paragraph is the question of whether the companies in the business should be compensated out of the fund for research and development costs to advance their services beyond what functional equivalence requires. And what the FCC says unambiguously in paragraph 11 here is they're not going to cover that compensation, that it would be an impermissible use of the fund, they say, because TRS services, features, and enhancements that go beyond the applicable TRS mandatory minimum standards, the standards the FCC has promulgated to ensure functional equivalence, are not necessary for the provision of functionally equivalent service. And that is because mandatory minimum standards, that is because is a paraphrase, but they're back to a quote, mandatory minimum standards define the level of functionality that a TRS provider must provide. So what they're saying here is we will not cover the R&D costs of innovation. It's an inappropriate use of the fund. But then to try to justify the tiered rate structure, they're going to say, well, if we spend this additional money that would otherwise be inefficient under the tiered rate system, it will create some spurs to innovation. But one could read that actually you could flip that. I mean, it says that the commission is disallowing TRS fund support for individual provider research beyond meeting mandatory minimum standards. But let's say you have a big spurt forward in technology for the non-deaf community, and there's a conundrum. How is the deaf community going to have functionally equivalent forward technological advance? That, it sounds like, is something that at least this paragraph might allow, because it's research and development to parallel, to meet the functional equivalence goal, as opposed to going beyond meeting that goal. And you still, there is a translation involved. So simply having a law that ties what deaf people should be provided to what's going on in hearing telecommunications, that's just a legal requirement. There's a technological engine that has to produce the functional equivalence service opportunity, right? And that's something that I think the FCC is concerned about, and that I don't see as necessarily being foreclosed or devalued by paragraph 11. I guess the reason I would push back on that respectfully, Your Honor, is that the question the FCC has to answer to justify the maintenance of the tiered rates is not just whether it might create some spur to innovation, but whether it is, in the language of the statute, the most efficient manner of doing so. And it seems to me elusively clear that covering R&D costs of innovation is a far more efficient way of doing so than this backdoor approach, and that you will not find a word in this order in which the FCC tries to justify this spur to innovation idea on the ground that it's the most efficient manner of trying to incentivize innovation to close that gap. I wonder, just stepping back, if you could tell us a little bit about what is the competition in this very lopsided market? How do individual deaf people choose services, and is there a growing market for these services? Are there people who might want them who don't have them? So, Your Honor, I apologize. I don't know the specific answer to the question whether the market's growing. I don't think so, though. I think it's a relatively stable market. There's an obligation under the law that, to the extent possible, that persons be provided with this functionally equivalent service. That obligation actually falls by law on the common carriers, the phone companies and 225C, and that this system has evolved as a way to accomplish it. And in terms of the way in which this system works, I do think one point is really important is that it goes to this efficiency gap problem, that the way in which companies normally have incentive to become more efficient is price competition. They need to lower their costs so they can undercut their competitors. So that doesn't happen in this market where the FCC sets the rate. So no price competition there. So there isn't that incentive to get efficient, and that's why we think we've got to build a regulatory mechanism. Although, isn't there, under a set price, still incentive to lower your costs, because whatever the price is that's allowable, you'll get more of it as revenues? So, you know, not really, I think, is the best answer to that. I know the Commission has said that, but here's the problem with that way of thinking, and the experience of the prior four years vividly illustrates the problem with it, that you may have a short-term incentive to lower your cost because it'll increase your margins in the short term, but if at the end of the four-year period you know that you're going to be engaged in another round of cost-based rate setting, you're going to cost yourself money the next time around because the new rates are going to be set off for lower costs, and that's incentive that we think greatly diminishes any incentive they have over the short term. Now, I don't want to go beyond what we've cited in our briefs, but that is a principle, and there's a case we didn't cite in our briefs, but that's a principle that this Court has recognized in other rate-making cases, and if the Court wants, I'd be happy to provide a citation to it. And I do think that that's why, and it just isn't anything in the system to close the efficiency gap. So four years from now, they're not going to be in any position better than they are now to engage in the kinds of things like reversal options and others to bring about the kind of competitive environment they want. If you don't close the efficiency gap, they're going to be exactly where they are now and exactly where they were four years ago. Although the rates have been going down over time. For us, yes. But also the higher rates, no? Well, what happened was from 2013 to 2017, they tried to make them go down. It didn't work. They went back in, and they jacked them back up. If you look at the rates they set now, they're higher than the rates before, and if you look at the number of minutes to which those rates apply, they're a vastly greater number of minutes to which those higher rates apply. So you look at that. This is less efficient now than it was when the system started. It's more expensive than it was when the system started, and there's nothing in place to try to close the efficiency gap, and so we just think you cannot justify this order. Can I just ask one question to follow up on George Fuller's question about technological advancement? And just to the right. Is it true that if you had to do research and development to catch up to technological developments that were happening for the hearing community, that that would be reimbursed? I thought they were not reimbursing anything that wasn't defined just to get to the mandatory minimum standards. That's correct. Do you know when the mandatory minimum standards were last updated? I don't know that, Your Honor, for certain, but they can update them over time. And, of course, if I may, I realize I'm pushing my luck here a little bit, but if I may, in terms of providing services to Spanish translation services or services to the deafblind, an exponentially more efficient way to do it is just include it in the minimum standards. Then everybody's got to do it. It's available. There's a guarantee that it's available, and you don't incur these kinds of costs, and that's the problem with the way the FCC is approaching this. They really can't justify what they've done in terms of functional equivalence, and yet that is the sole way they've tried to justify it. But the concern is that monopoly, which would be the practical effect of the other approaches, would leave the monopolizing company very little incentive to innovate. Is that relevant to both functional equivalency and efficiency? Well, our proposal is designed to keep the purple Z commodity in the market with a drive towards closing the efficiency gap over the long term. But I will say the issue of wanting to work here is because Sorenson is, by a considerable measure, more efficient than any of the other companies in providing this service, and we're operating under a statute that requires that the service be provided in the most efficient manner possible, and therefore it's probably not surprising that Sorenson's in an advantageous position given what the statute requires. Now, as I said, we're not saying that there's inevitable monopoly here. I'm pushing for it. The Commission has the authority to consider the efficiency over the long term. That's what this Court said four years ago. Clearly right. But they're not considering efficiency over the long term. They haven't done anything to close the efficiency gap. There is suggestion in the record that the reason that Sorenson is the most price efficient at this stage is because it got a highly subsidized and very great head start in the market, and that interoperability is only just beginning to be resolved and that that's a bigger hurdle than the Commission believes and that there really is a concern that if Sorenson is the only provider, that that really won't be good for the quality of service or the price going forward. What's your response to that? Several responses. First, Sorenson wasn't the first out of the gate. I forget whether it was Z or Purple, one of the two. They were the first. They've been there longer than we have. So it's not that we have some first mover advantage. Not the case. We were better. So that's why Sorenson is where it is. Second, with respect to this question of the concern over time, again, I think the question that the Commission's got to answer, and it doesn't even try to answer here, is whether its concern is addressed most efficiently by this tiered rate structure and keeping these other companies, particularly the really tiny ones, afloat. Now, what I would suggest, one way of thinking about why the risk is not as great as your honest question maybe supposes, is to look at the penalty provisions for providing service that falls below minimum standards. It's a very lengthy regulatory site here. It's 47 CFR 64604C53iE4, and you can find it at page 11 of the appendix to our brief. Basically, if a company- Sorry, can you say that one more time? I don't know if I can, but let me try. I meant the 604, just the stuff that comes after 604. It's 604C53iE4, which is at page 11 of the appendix to our brief. And what this provides is that if a company falls below the minimum standards on a given day, the FCC does not pay them for that day. And that has happened to Sorenson. It's happened to other companies, too. If you think about it for a minute, and sort of think about what Sorenson's revenues are as reflected in the record, a one-day non-payment is a very, very substantial fine. And so I think that in answer to your honest question, what the commission is going to do, because the statute requires that the services be provided in the most efficient manner, is answer the question of whether that kind of robust enforcement scheme with extremely serious penalties for falling below minimum standards is a less efficient method of securing quality of service over the long term than the tiered rate structure that keeps these other companies in. Again, they didn't try to answer that question, and therefore you can't uphold the order on that basis. I'll reserve my remaining time for that. Good morning, and may it please the Court, my name is Anthony Kaye, Counsel for the Video Relay Services Communication Association. I'd like to reserve 30 seconds of my time for rebuttal, please. In 2013, this Court ruled that by adopting a new speed... Would you begin by telling us the relationship that your entity has with Sorenson? Well, the entity is an individual entity run by Sharon Hayes. Sorenson does provide... Is it a single member? No, no, there are about 10,000 members. I see, okay. She's the director. Actual members. Hmm? Actual members, because there's some dispute about... Yes, well, there's a dispute. I mean, it's not a membership like a club, but there are 10,000 people with whom the organization communicates on a regular basis by email and on whose behalf they advocate. Well, that's membership... Right, the difference matters. It's not... Well, there's no charge for membership, if that's what you're... No, but people have to fill out a form and say, I'd like to be a member, or do you say anyone who sort of... Who counts as a member? Anybody with whom we communicate on a regular basis would count as a member. And they don't have any role in selecting leadership, or they don't pay dues? No, they do not. Do they have any role in the positions the association takes? Formulating or influencing? Well, they communicate with the director and provide information... They're not providing money. They're not voting for anything. What control do they have over... The whole point of associational standing is that the association is the voice of its members, and if its members don't like the message, it won't... Well, for associational standing, only one member is required, and Ms. Hayes is a member, and that's... But they have to be a member, but that assumes the predicate fact, which is whether it is actually a membership organization, which is what we were probing. If it were, her position... There's a different argument that her position would suffice, but if it's not a membership organization in the first place, then her being the member on whose behalf the organization is suing would not suffice. Well, why do you have to... Is there a rule that you have to have... I suppose I shouldn't ask you a question, but I don't believe that an organization has to have more than one member in order to be an association. I mean, it can be a... So you're saying... You can have one. I'm not saying that there is one. I'm not going to concede that there is one, but it's very clear that Ms. Hayes, who's submitted comments in this docket for years before she became a member and a member of the organization... What makes her a member? What makes her a member? She... As opposed to the people that you communicate with, or are you saying it's the same? Is her position different, her membership different than everyone you communicate with? Yes, she runs the organization. She helps decide what positions it's going to advocate. She communicates with counsel to make decisions on what positions she's going to advocate. Is there anyone else similarly positioned in this organization? Well, she's the director, so she's the only person making those ultimate decisions, but she does that in communication with other individuals with whom she speaks who are deaf and hearing disabled. On a regular basis at meetings around the country, through e-mail communications, you're trying to... I'm not going to say that this is like the ACLU where everybody pays $50 a year or $25 a year, but I can tell you that I have never, as a member of the ACLU, been asked what issues I would like them to advocate on my behalf for. All I do is write a check. You don't like the positions they take. You stop writing checks and you let them know that you're withdrawing or resigning as a member. Does that happen here, or do people just unsubscribe? People would unsubscribe. I think you were about to explain the relationship between Sorenson and the VRS. So, Sorenson provides some funding for... Summer funding. Yes, for... Does this funding come from other sources besides Sorenson? I don't. Probably not. I think Sorenson is their main source of funding. Main and only? Ms. Hayes contributes her own money, but it would be a small amount in comparison to what would be contributed by Sorenson. Do the subscribers pay for the information that they get? No, it's provided free of cost. Do they donate money? Is there a donate here button? No. There's no donation? There's no donation solicited. The members... Does any other of the video relay services or even common carriers make donations to this organization? They do not, as far as I'm aware. Is there any way you could verify for this court whether there's any other funding? If I can submit a brief afterwards, I can go back and find out if there have been any other sources of financial support for VRSCA after, if that is helpful. In the rules of our court, the precedent of our court, you're supposed to show standing in your opening brief, or it needs to be self-evident in the petition. In what way have you done that? We submitted... In our opening brief, we referenced comments submitted by a member, Sharon Hayes. We referenced several comments that she made stating that she is deaf and that she's a member and that she uses VRS to communicate. And then in our reply and response to this, she said, I'm saying, what's the case that you made in your opening brief that there is associational standing here? And I think you answered the question. Okay. The difficulty is she may well have had standing as an individual, given what you've said about her interest in this issue and in this matter, but that's distinct from whether she has standing as a member of a membership organization. And that's the case that you presented in your brief, was that you have a membership organization, you represent a membership organization, and she's the member for standing purposes. And that's a different inquiry, and it's not as clear that you've made that case, given the lack of evidence that this is, in fact, a membership organization. The case that we're relying on for this is Sierra Club v. EPA, 292 F. 3rd 895, which is an opinion of this court. And the law that is set forth there is that so long as any individual member has standing, the association has standing. Right. But the question is, and that was a situation in which there was no doubt that it was a membership organization. So it doesn't really speak to this question. I'm not sure. Actually, in the Sierra Club case, associational standing wasn't found because the Sierra Club hadn't identified any specific members who had standing. It stated generally that it had individuals who lived near the environmental hazards about which they were concerned. And that's why associational standing wasn't found there. That's all your declaration does here, too. She says, I'm deaf and I use VRS, which is no different than saying I live near the waterway. Well, she uses the VRS services, and her complaint is that there's going to be a decline in VRS services and service quality if rates are cut. We don't know which service she uses, do we? Is she a Sorensen user? She uses multiple services, but I would assume— We don't have anything in the record telling us which service she uses. Your Honor, with respect, why should it matter? If she's using VRS services, they're all covered by this rate making. Because whether she would be adversely affected in a way that an order would remedy is a question. Well, the general concern that she's raised is that by reducing rates without having conducted an evaluation of service quality metrics, that it's unclear—well, there's a general concern that for all of the providers, not just Sorensen, that rate cuts have shown in the past that service quality has gone down, particularly with interpreting quality. Interpreting is important for the members and for deaf people in general because it affects their ability to communicate, and it affects their perceived confidence. Did she allege any place in her— I see nothing in the declaration, and I didn't see anything in her testimony that says she individually has suffered a deterioration in service. Well, she says in commentary that they have observed. So the comment— What do you mean, who are they? Well, so she has observed—I mean, that's based on her observation. And in discussing with her, her biggest concern is a decline in the quality of interpreting services. Well, you say a concern. If I read her submissions, they were more sort of, you know, I think the law is being violated, and that really bothers me because, you know, I like this law and I'm someone who could be affected by this law, but she doesn't say anywhere that she's been injured or facing imminent injury or direct injury as a result of this. Right, and she hasn't commissioned a study to look at the broad picture. She doesn't have a commission to study. I'm talking about her personal experience. You're talking about her as the individual member here. I mean, you have a declaration that says, I'm deaf and I use VRS, which, again, is just the beginning, not the end, of a standing inquiry. We all know it has three prongs. You have to show injury and redress. And I just didn't see what her injury was. You have to show a likelihood of injury. You don't have to show actual injury. And where did she allege a likelihood of personal injury? In comments. Where? Or if you could let me know on rebuttal. So her comments were at JA108-09. And do you see in there a – again, if you'd rather do it on rebuttal, that's fine. But do you see in there where I missed an individualized injury or individual risk of injury? Okay. I'm going to forget it. Quality of intervention appears to deteriorate. But she doesn't have to say that she's suffered any deterioration. But, I mean, it's necessary. I mean, if she didn't say, I have suffered this personally, if she's saying it's appeared to, it's based on her observation. Well, appeared to actually sounds like I didn't suffer it myself. Maybe she heard from someone else or something. But actually, if I had suffered a deterioration, I wouldn't go, well, it appears there was a deterioration. Right? That's not how we speak. We go, it was worse for me on Monday. Right? That's kind of at least how I would read that language. Well, I mean, with respect, I think the general concern here is a perception that she has from her experience as the director that over time, as rates get cut, the service quality goes down. And, ironically, it's the FCC that should have been evaluating service quality metrics over the last several years but has only opened a docket since last year to look at this issue. So there's no data at this point to evaluate it. And the basic point that VRSA is trying to make is that without an objective analysis of service quality metrics, there's no way to know whether these rate cuts are going to contribute to a further deterioration in service quality. And it's just a basic, you know, if you're trying to deliver functionally equivalent services, understanding whether or not the level of service quality is up is not as important. And one can assume that if rates keep getting cut, it's going to impact service negatively, not positively. Mr. Kaye, is there a growing market for these services, or is it basically a fixed number of people and most of them have access to the equipment and the service? Most don't have access. Well, not most. Many people don't have access. So there should be a growing market, in my opinion. Is this the kind of thing – so there are deaf people who don't have access because – Deaf people are disproportionately lower income, and lower income people have a harder – can't afford – all can't afford broadband. And broadband is one of the things that you need to have access to VRS services. Because the FCC is in a process of including broadband in its minimum services. It's trying to, but it hasn't – it's trying to, but it hasn't – you know, the amount that it will pay to individuals for broadband is way below the amount of – that's required for VRS services. Is there also a market among businesses or individuals? I mean, if I wanted to call a deaf person, I couldn't use VRS because I don't have it at my home. Yes, you could. You pick up the phone and you call a person that you know who is deaf and it gets routed through one of the providers. Or if I had a deaf house guest, that person couldn't call from my house? No, not unless they brought their own video phone or used a tablet or some other, you know, FaceTime. I mean, there are ways of – there are other forms of technology that you can use now besides a video phone. But a video phone is what's used by most people. And is it really better? I wondered about that, why a desktop with a camera isn't just going to put this whole question about equipment off the table. I wondered that too. But, you know, as a practical matter, a lot of the – you're dealing with a lot of elderly people and people who have not adapted to the changes in technology yet. So equipment like video phones is still relied on heavily by the market. I agree with you at some point. I think it's going to be – it's going to become outdated and, you know, FaceTime and products like that will be interoperable with – Thank you very much. We have your argument. Thank you. Thank you. Good morning, Your Honor. Sam Grayfash representing the FCC. I think everybody this morning understands that the point of the statute that we're dealing with is to provide deaf and hard-of-hearing individuals comparable quality telephone service to the services provided by individuals. Functional equivalency is the term the statute uses. According to Sorensen, this simply involves the FCC setting minimum standards. And once it sets the minimum standards, then it has to adopt the lowest-cost way of implementing those standards. The Commission has taken a different approach for several reasons. One is because functional equivalency is not a static matter. Functional equivalency is – It seems to me the FCC is the one that has said time and again and again that what functional equivalency means is compliance with the mandatory minimum standards. And we are not going to look at the issue from the perspective of the consumer. It's a technological equivalency in how service is provided by service providers. We won't look at it when it comes to innovation. We won't look at it when it comes to access to the necessary equipment. And then all of a sudden here, for the first time, without explaining all the times you've previously defined functional equivalency as compliance with mandatory minimum, you're saying let's throw in a little nugget here where we look at it from the consumer's perspective and say they'd like to have choice. Well, they might also like to have broadband and equipment they can afford, but you refuse to look at it then. So isn't there an inconsistency in the FCC's position here? I respectfully disagree with your statement that the Commission – this is the first time the Commission has ever looked at it this way. That's not true. And the Commission has, on a number of occasions, talked about the fact that it needs to consider consumer choice and the benefits of competition because functional equivalence is a changing consideration. I point you particularly to Paragraph 31 in the Joint Appendix 17, Paragraph 31 in the order. And footnote 92, which cites four or five Commission orders going back to 2000, in which the Commission has pointed to the benefits of consumer choice and the innovation provided by competition as an element in determining. No, no, no, no, no, no. That's just saying the same thing you said here. Am I wrong that the FCC has repeatedly said that what functional equivalency means is compliance with the mandatory minimum standards? That gets there now. The Commission has said that one element of functional equivalence. One element? Where have they said one element? Well, the Commission was not faced with someone saying you can only limit it to that. It's true. No, they were. They were faced with it when people said, hey, let's support providing this equipment to people who can't afford it. No, no, that's looking at consumer choice as much as anything else. If they can't afford the equipment, they can't even choose to be able to communicate by phone. Respectfully, Judge, the Commission's judgment was that the statute did not extend to the provision of equipment. Because? Because the statute talked about services. Equivalent services. That's right. Equivalent services. It didn't look at the consumer's interest in choice, which you're doing now. You look at it only from a technological service perspective. And now to say we'd like consumers to have the same choices that everyone else does seems to be inconsistent with the statement that we're not going to allow these companies, all of the companies, to help cover the cost of the equipment for people to even be in a position to choose anything. It wasn't, Your Honor, respectfully, it wasn't the Commission saying we have a range of choices and we choose not to adopt a policy of allowing service providers to provide equipment. The Commission interpreted the statute to restrict compensation to the provision of services and not to equipment. And this is a determination. What I'm getting to is the rationale. My understanding of the rationale there was that the statute focuses on the service end. The service needs to be equivalent. The statutory text, as you even said, the text compels it. Statutory text says we don't look at how it feels on the consumer end, what options they have. We look at the service. Are we providing equivalent service? There's nothing in there that says consumer choice. Equivalency in service is not the same as consumer choice. Consumer choice is from their perspective. Look at it from the consumer's end. And that seems to me a change, quite a change in the FPC's position. Well, I'm obviously not making myself clear on this, but if the Commission had understood when it addressed the issue of providing equipment in the past, if the Commission had understood that the statute permitted compensation for that, I believe it very well might have included compensation for that as an element of consumer choice. If I can just point to that. I was just going to say bracketing the equipment question, and you pointed us to paragraph 13, and you talk about competition to ensure a range of service offerings and incentives to improve VRS offerings and maintaining higher standards of service quality than if it faced no competition. And I wondered if you could give us examples of the kinds of service improvements or benefits that are encompassed within functional equivalent service, and bracketing and putting to the side what the Commission has said is not encompassed. Well, one is that an example of service quality that involves both a mandatory minimum standard and an element of competition is this issue of speed of answer, how quickly a VRS provider answers the phone when a consumer calls. The Commission has a rule on that for VRS. It requires speed of answer to be two minutes. Now, no one really thinks that if you picked up your regular phone that if you had to wait two minutes to get a dial tone, that that would be acceptable. The Commission tried to reduce that by adopting a reduced minimum in 2013, and because of the inadequacy of the record, that was remanded. What the Commission has attempted to do, so that standard remains in effect. What the Commission has attempted to do to provide the benefits of competition is that it now publishes a provider's performance, and their actual performance is significantly less than two minutes. That's very helpful. Are there other examples of service improvements of the kind that might be affected one way or the other by more or fewer participants in the market? Well, look, the Commission in the 2017 Further Notices of Proposed Rulemaking, which is at paragraph 155 of the Joint Appendix, the Commission has listed a series of things that it is exploring that would not be mandatory but would be optional services. One is skills-based routing where service providers could provide, for example, interpreters who were specialized in technical areas or legal areas. Another is the provision of deaf interpreters, a specialized form in which there would be interpreters who are themselves deaf, and there would be two interpreters on the line, which is helpful for some users of DRS. Another issue is at-home interpretation, which the Commission has, for several reasons, the Commission has been hesitant to provide in which interpreters would operate from home instead of from a call center. But those aren't required by the mandatory minimum standards. Those are not required by the mandatory minimum standards, but the patient has begun tests of those and with the idea of authorizing them, and this is something that's... Does it pay for those services now? Pardon me? Does it pay for those services now? The services are not, to the extent that they are part of these tests, developmental tests, yes, it will pay for them. They're not authorized to be paid for now. I suppose they could be provided, but they wouldn't be part of it. I'm sorry, I'm confused. Right now, if a company were to provide this in-house interpreter, could they then include that in the way that they think they need to get from the fund? Well, some of the in-home interpretation, for example, is not permitted now. That's not authorized. Something like skills-based routing, I think that potentially could be authorized. But none of it is right now. None of it is right now as far as I know. Just to circle back, just to close the loop on this one point, I was curious what were examples that would substantiate the point that you were making by reference to paragraph 31, which was that competition was important to improve VRS offerings, higher standards of quality of, as I understood it, the mandatory minimum service. And you mentioned answer time. Are there other aspects that are now part of mandatory minimum service, but where the quality could be really affected by competition or not? There are mandatory minimums that, for example, address interpreters. They require certain, this is section 64.60. This is, again, 64.604 of the rules, but this is right at the beginning. On page 14 of our statutory addendum, 64.604A, operational standards, which actually go beyond technical standards. And right at the beginning, it has standards for communications assistants or interpreters. And it requires that they be competent in skills in typing, grammar, spelling, interpretation, familiar with hearing and speech disability, cultures, language, and etiquette. Now, this is a fairly general requirement. This is an area, for example, in which I think there is competition now. There's competition for getting the best interpreters. And this is something that the service metrics proceeding with the commission has begun. It's trying to determine how it can measure the quality of service of something like this and make this available to the public, to users of PRS, so that they will be able to make a choice, if they have a choice, between a company that provides better quality interpreters than some of the others. Is there anything in the record about, for example, incentive-based wages from different companies? If I were a very skilled deaf ASL interpreter, I might expect to get a higher wage if there's more than one company bidding for my services. But is there anything in the record on that? If there is, I'm not aware of it, Your Honor. The compensation of interpreters and the quality of interpreters is a subject of continuing debate, I believe, as a general matter. But I'm not sure there's anything specific. Where did the SEC say that we want consumer choice, that competition so there's consumer choice so that the service provided will be better, as opposed to, as I read it, we want consumer choice because that's what people who are non-deaf have? That's what I read. Where do they say? Well, again, back to 31, one of the reasons, paragraph 31 on JA-17, one of the reasons the Commission says it believes competitive choice is necessary is because it provides a competitive incentive to improve VRS offerings. I'm not sure if that addresses. That was certainly what the Commission was looking at because it believed that the. . . But it found that hadn't happened. Pardon me? How is that going to happen? It had found that hadn't happened for the last four years. All we were talking about was interoperability was the only thing left to work on. Interoperability is a significant issue. That's not translators. That's technical equipment, right? Interoperability is technical equipment, yes. So that's not a consumer. The interpreter is good as part of the service end of things, right? It's just not a service if the interpreter isn't doing the interpreter's job. But when I heard the Commission talking about consumer choice, it seemed to make perfect sense that non-deaf people have choice of providers and the deaf community should as well. It seems perfectly sensible. It just seems quite inconsistent with the FCC's decision time and again before that functional equivalence measured by compliance with the mandatory minimums and it's looked at from the service end. Time answering calls, quality of interpreters is a service end. And the FCC hasn't looked from the experience or choice. . . If it did, then it would have to help them out with their extraordinarily high cost of equipment. Well, again, I think, for example, those sites and footnotes 92, I think, address that issue rather. And I think it's certainly true that. . . Did they say anything different there than what we just said, and that is that we want to have choice because we think they should have choice, like non-deaf customers do? Well, perhaps not. It's the same thing. I'm not sure that I looked at them in that context. But, again, this is functional equivalence, as I said right at the start, is a dynamic and evolving process. And the Commission's attempt to address that issue and to ensure that. . . The Commission said it's dynamic and evolving? Yes. From a technological perspective or from a consumer end? Well, I think both. Technology is certainly dynamic and evolving. It certainly is because the functional equivalence when TRS was first provided was a teletype machine. Right. So from a technological end, I take traditional notice of the fact that it's changing rapidly for everybody. Right. But from a functional equivalence as a matter. . . It provides competitive incentive for providers to improve their service. Let me ask you, Mr. Patterson, what would need to happen before 2021 for the providers to be on a more equal footing where the FCC might migrate toward one rate? Is that a goal still for the FCC to migrate toward one rate? I think the Commission would consider that ideal because that would be, to the extent that we're looking at lower cost, that would be a more efficient rate. And what would need to happen, and is that on deck? I'm not sure I can say it's on deck. What would need to happen is that the smaller providers would have to become larger. And when you're in a market when one entity controls 80% of the market, it's unlikely it's going to change dramatically. Would two providers suffice from the FCC's perspective? I can't answer that question. I think the Commission, that would provide some competition. But the Commission is committed to reexamining this, certainly by 2021. We defer to the predictive judgments of agencies a great deal, but why should we defer to the predictive judgment of the FCC on this one when you got so wrong in 2013? There was a predictive judgment that this would head towards more competition and better choice for consumers, and it hasn't. It hasn't. So what's going to change this time that should appeal to our desire to defer to predictive judgment? Well, Judge Gerber, there are a couple of things. Number one, keep in mind that BRS is still a relatively new service. It certainly was quite new in 2013 when the Commission made those judgments. Secondly, the smaller providers are working things out. Wait a second. Quite new? I mean, there was a 2010 order. It's been a decade, right? Yes. Okay. It's not normally quite new. Well, the PRS service goes back to 1990. So as an element of PRS service, it's a relatively new service. But, yes, it has been for more than 10 years. But the Commission – You say that the smaller companies are working together. What do you mean by that? Well, two of the smaller companies have combined, and they're going to, by 2020 or sooner, they will become one somewhat larger company. And combined they will have what percentage of the market based on current numbers? Maybe 10%. I'm not sure exactly. That's changing as well. The third provider, who Mr. Rosen is representing this morning, who Mr. Rosen is representing, well, is also increasing. It's still in the emergent category, and I think it's like perhaps 3% of the market. But their service is improving. So I think it's not high in the sky, so on, to think that there will be some improvement between now and 2021. Where does the Commission say that imposing this tiered rate structure, this revised one, will not just keep these smaller companies alive, keep them on life support, but will actually, with any realistic prospect, that it will empower them to take over enough of a share of the market to actually viably compete with someone who's got 80% of the market now? That's what the SEC needs to find to say that this is going to lead to real competition efficiencies. Where does it make that connection? I'm not sure the Commission has made that conclusion. What the Commission has made is sort of the opposite conclusion, which is without this tiered rate structure, there would be no hope that these or any other providers could survive if there was not a tiered rate structure. I didn't say that. As to Sorenson's proposal of this sort of flat rate that would be big enough to accommodate at least one other provider, the concern there wasn't that they wouldn't survive. It was that Sorenson would get paid too much, but that's not the same as the competition wouldn't survive. No, what the Commission said is that that would provide at best maybe one additional competitor at a much greater cost to the TRS fund. That would be much more costly than the… Well, they say that if you back out the R&D stuff that it would actually be cheaper. Do you dispute that? I'm sorry. Sorenson said that when the Commission made that conclusion, Sorenson's number had included research and development costs that the FCC subsequently said we're not going to include, and if you back that out of the price, they said it would be cheaper. I don't think the Commission would be willing to back that out of the price for two reasons. One is I think the Commission views the R&D costs to be a very difficult matter to oversee from the perspective of waste and abuse. What the Commission did do, I would point out, is the Commission devoted $6 million to research and development that the agency itself will oversee. That's at the end of the order. Let me ask you, Mr. Posh, about the ZBRA purple deal. My understanding is that those two companies are merging. Yes. And there's a provision in their consent decree that they have up to three years to do that. And as I understand the Commission's order, they're permitted to be treated as separate, whether they are in fact separate or not, for purposes of qualifying under the tiers. And I wondered why that is and whether that's non-arbitrary, and if so, what the support for that is. I don't think that's the proper characterization. What they're permitted to do is to continue operating as separate companies until their merger is complete or until 2020 when they have to complete it. If they complete it before 2020, then they will operate as a unified company. So, I mean, they're still operating as separate entities right now, and they have not completed the merger. And is there a criterion by which the Commission will know? Yes, there is. I can't describe what it is. Is that in the agreement? It's spelled out in the terms of the agreement, or the term of merger. It's spelled out in legal documents related to the consent decree. Once they are factually merged, will they then be treated by the FCC order as a single entity, or will they continue that status until the last year? No, they're treated separately as long as they're separate until 2020 when they're required to merge. Any other questions? We have no further questions. Thank you very much. We'll hear from Mr. Rosen. Your Honor, my name is Jeff Rosen, and I represent the four remaining FCC certified PRS providers. Our statement of the matter is that if the court granted Mr. Rosen misplaced inefficient arguments, that would cause us to be inability to disclose any of what was called monopolies. And we're deprived from this merger of hundreds of thousands of consumers. Of course, I'm the general counsel of Combo BRS, a debt-owned and operated company established in 2011. Under the 2013 rate, we struggled because we were not able to pay for all the consensual allowed costs. So we borrowed $9 million to continue business. And under the 2017 rate, we are finally able to breathe. We are finally able to invest in our business. And we're able to grow as a result of that. We're growing at about 6% monthly. And we are on our way to outgrowing the emerging peers by the end of this rate period. On what basis in the record will your companies be able to compete effectively without a tiered rate structure after 2021? We are looking forward to resolving the interoperability issue. The ones that have always said that interoperability is a non-issue. And even BRSA said they say nothing about this problem because they don't make those kinds of claims. We have a market where tens of thousands of pieces of equipment were distributed for free that are not interoperable with any other company's device. Those BRSA providers are using devices that are not interoperable. When we contact customers of other BRSA providers, our first question we have is, can you see me? And often it's a black screen. It is very difficult. Sometimes it takes 15 or 20 minutes to connect. We do not have that kind of technical issue when you make your phone call, your audio call. You expect us to be able to immediately begin a conversation. We have this issue where many customers have tried our phone and they find it difficult to connect. Will that be resolved by 2021? Will that be fixed under this tiered rate scheme? Or will it have to continue probably longer? Yes. The FCC has adopted interoperability standards, which began in December of 2017, and they should have begun long ago in the old rate structure in 2013. But it has been delayed. Finally, in December of 2017, we established a platform that will be able to test, assess, and enforce interoperability. The first test will be in two weeks, conducted by the FCC contractor called MITRE. We are looking forward to being able to make progress with interoperability. Is that the only barrier, the interoperability that you see to allowing your company and the other smaller companies to actually be able by 2021 to be serious competitors with Sorenson, or are there other barriers? The rate is a barrier. It used to be a barrier with the 2013. We were involved in it. We could not worry as far as wanting to sit with it. Now we're able to invest in our business and grow. To answer your question, interoperability is a significant issue. When you do not have interoperability, then you're experiencing a majority of customers being locked into a Sorenson product. I have heard over and over and over again Sorenson customers say, I don't really feel like their quality of interpreting is great, but I don't have any choice. We had a lot of discussion this morning about choice. But I would say that the inverse of that discussion is those who don't have the ability to afford out to another provider, like an equipment issue, then we have a challenge of choice. And so those things. Let me ask you, Mr. Rosen, your view about the potential markets that may be untapped. Is this an issue of everybody competing for aspects of a market that is already participating, the customer base already participating, or are there new customers that may enter the market if there are more appealing products and interoperability is resolved? To answer your question, there are a lot of consumers who are still underrepresented in VRS. Deaf-blind consumers, for example, currently have a hard time participating in VRS because the technology is not where it needs to be to provide those services. We have to keep making progress in those areas. Other areas where we have a problem are those with limited English proficiency. Often they have a tough time being able to communicate with interpreters because of different language abilities. So that's where deaf interpreters come in. They're able to help overcome some of that. To answer your question, yes, there are still significant untapped markets. So you also have to understand that the market that we have currently is not being fully developed. We continually must continue the dynamic of functional equivalency. How big is the percentage of people who simply can't afford, elderly people in particular can't afford, or impoverished people or elderly people who can't either afford the technology or are sort of limited in their technological capabilities? How big is that market? It's considerable, no question. As are many other factors, what the FEC offers for low-income persons is Lifeline. Lifeline and Lifeline Link can get their funding under Lifeline, Lifeline Link, purchase broadly. Also, almost every state has equipment distribution programs. Prior to this, deaf people were able to afford PQI. You know, the old-fashioned type box phone. That cost maybe $500 or $600. We were able to afford PQI. So Norrison came up with a method that deaf people can't afford. There's no way they could acquire their equipment. The only reason they wanted to sell that idea is because they want those consumers to give up their equipment to lock them in. Consumers, just like Ma Bell with the rotary phone. Not until the courts separate products and services did we have a more flexible market. And that's what the FEC is trying to do. Trying to refocus, instead of distributing the right small equipment, that people should use off-the-shelf devices. You made a great point, Judge Miller, about if I go to someone's home, a consumer who does not have a device available, how do I access VRM? I do it on my phone, on my mobile phone. I am able to make calls. That is how the industry has evolved. Sorenson's a dinosaur. Their biggest market are veggie boomers. The greater part of our upcoming market relies on software and the ability to access VRM through software. So, Mr. Rosen, would you identify areas of service equivalence that either now or in the near future, you believe, will benefit from provider competition? We heard from Mr. Posh about speed of answer, about the quality and versatility of interpreters. Are there other aspects under equivalent service where competition is an important engine to the quality? Well, I'd like to point out the difference between VRM and in-person interpreting. For example, I have a fantastic interpreter here with me today, whom I know and have known and worked well with for quite some time. And we discussed these subjects before we arrived. With VRM, your interpreter takes a call with no background, with no idea of who the person will be, no idea of who the person will be speaking to. And it's a tremendous challenge. And we have to improve those. We have to develop technology to be able to acquire information more immediately from the consumer, to assess their language, context, the purpose of the call, and to be able to process it. Some companies focus on efficiency. They are very much pursuing, racing to the bottom with efficiency. Some other companies are focusing on effectiveness. And Mr. Kaj can play. Some factors are critical for effectiveness. The FCC has taken on rulemaking that looks at matters of measuring effectiveness of the call. And that will help push the quality. Mr. Rosen, you don't mean to concede that the only factor that matters for efficiency under the statute is price, do you? No. So you're talking about service quality and delivery of equivalent service to the consumer as something that the FCC wants to do efficiently? Yes, that's right. There is a balance of competitive factors. The APA is written in a way in terms of various factors. Sorensen focuses only on what? Efficiency. But that is a very specific part of the statute. There are other parts of the statute that are more important to the commission. And obviously, a person can benefit and do well from using telecommunications to be involved with hearing people. And that is the concept of functional equivalency. Great. Thank you very much. Thank you. Thank you. We took up all your time. We'll give you three minutes back. Hurry up. Thank you for your graciousness, Your Honor. On the question of whether functional equivalence encompasses anything more than minimum standards and what the FCC's position historically has been on that, I'm sorry, but what they're saying just isn't right. I'm going to identify four places to look. First is paragraph 11 of this very order, where they expressly define functional equivalence as meeting minimum standards and refuse to pay for R&D to advance beyond it because it's not functional equivalence. Then the 2013 order, which we cite in particular the part of it in paragraph 198, I think it is. We cite it in page 37 of our opening brief. In the 2013 order, the FCC said that consumer choice is not a valid reason for maintaining the inefficiencies of the tiered rate system. And that's a problem both with respect to change in definition, but, of course, it's a deeper problem. And I think questions have alluded to it already in that what they're doing now is an unexplained, unacknowledged, 180-degree reversal from a specific conclusion, which we quoted at page 37. Third, I'd just direct the Court to the numerous citations at pages 12 to 14 of our reply brief where the FCC defined functional equivalence as limited to meeting the standards. And the fourth point I'd like to make about that is that, of course, it's about equipment, but it's not just about equipment. And paragraph 11 shows you that. It's R&D to improve services that they won't pay for in addition to equipment. With respect to interoperability, it's taken on a great deal of importance in this morning's argument, and I would just urge the Court to do the following in coming to a judgment about interoperability. I'd urge the Court to compare the declaration that Swanson submitted, which is at J.A. 365 and 6, declaration containing specific evidence about what's happened on the issue. It states that the main interoperability problems have been solved as of 2012 with respect to all carriers except global VRS. It goes on and on. Contrast it to the submission of my friends on the other side, which is one short paragraph that carries over from J.A. 272 to 273. And I just don't think that the Commission can responsibly conclude based on that and that alone that the problem of interoperability is, A, a serious impediment, and, B, solving whatever's left to solve on it is going to make a material difference in this market going forward. One last point, just on the question of interpreters, direct the Court's attention to J.A. 705, where you will see that Swanson asked the Commission in this proceeding to increase the rate at which they would compensate interpreters because we made the point that the cost of hiring good interpreters is going up, and we don't just compete with other VRS companies. We compete with all kinds of people who need interpreters. And the Commission said no, and wouldn't fund directly the improvement, but they're relying on this tiered rate system by making an argument that they're going to improve it indirectly, and that's what they can't do. Just a question out of curiosity. How do blind and deaf people use video relay services? Are these people who are legally blind but have some sight, or is it having someone come to your house? I apologize, Your Honor, I don't know the answer. I should know the answer to that, but I don't. Swanson does provide some deafblind services, but again, just to repeat my basic point, that making sure that the deafblind population gets functionally equivalent service is really important. The way to do it is to make it a minimum standard. That's the way to do it. That would be much more efficient, much less costly, and would guarantee that the service would be provided instead of hoping that it's provided through maintaining all of these companies through the tiered rate system. Thank you. Thank you very much. Mr. Cage? Do you have anything on rebuttal? No. Okay. That's great. Thank you very much. The case is submitted.
judges: Griffith, Millett, Pillard